Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Nov 13 2013, 7:15 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**NOAH L. GAMBILL**
Wagner, Crawford and Gambill
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**DAVID E. COREY**
Deputies Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF E.B. (Minor Child), CHILD IN NEED OF SERVICES | ) | |
| | ) | |
| and | ) | |
| | ) | |
| R.K. (Mother), | ) | |
| | ) | |
| Appellant-Respondent, | ) | No.  84A01-1303-JC-95 |
| | ) | |
| vs. | ) | |
| | ) | |
| THE  INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE VIGO CIRCUIT COURT
The Honorable David R. Bolk, Judge
The Honorable Daniel W. Kelly, Magistrate
Cause No. 84C01-1208-JC-940

**November 13, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

E.B. was adjudged to be a child in need of services ("CHINS") by the Vigo Circuit Court. E.B.'s Mother appeals the adjudication arguing that it is not supported by sufficient evidence.

We affirm.

**Facts and Procedural History**

E.B.[1] was born on August 6, 2012, at Union Hospital in Terre Haute. R.K., E.B.'s mother ("Mother") suffers from a hearing disability, and has other physical and mental health challenges. At the time of E.B.'s birth, Mother was married to, but separated from, Leon E. DNA testing later revealed that Emanuel B. ("Father"), not Leon E., was the biological father of the child.

The day following E.B.'s birth, the Vigo County Department of Child Services ("DCS") received a report reflecting concerns of Union Hospital staff that Mother "appeared more concerned with her needs and her meals rather than focusing on [E.B.'s] needs" and that Mother seemed uninterested in bonding with the child, feeding the child, or changing the child's diapers.[2] The report also indicated that, after Mother was admitted to the hospital but before she went into labor, Hamilton County DCS had contacted Union Hospital to notify staff of an ongoing termination proceeding in Hamilton County involving Mother's other child, S.E.[3] Ex. Vol., DCS Ex. C.

---

[1] At the time of her birth, E.B.'s initials were E.K. After Father established paternity, the child's name was changed.

[2] Mother asserts that she was never asked to change E.B's diaper or feed E.B. during the hospital stay and that she interacted with E.B. appropriately while at the hospital.

[3] DCS initiated the CHINS case involving S.E. in Madison County when S.E. was about three months old, after receiving a report that Mother had taken S.E. to a shelter after a domestic violence incident between

2

DCS assigned family case manager Marshall Despain ("FCM Despain") to assess the allegations contained in the report. FCM Despain contacted the Union Hospital's social worker, E.B.'s doctor, and the nurses caring for Mother and E.B. Each person with whom FCM Despain spoke expressed reservations about Mother's ability to care for E.B. These concerns stemmed primarily from Mother's apparent inability to care for E.B. without assistance, Mother's quick temper, Mother's prioritization of her own needs over the needs of the child, Mother's lack of attention to and interaction with the child, and Mother's lack of cooperation with hospital staff.

FCM Despain also contacted Jeri Gibson ("FCM Gibson"), the Hamilton County DCS family case manager assigned to the case of Mother's other child, S.E. FCM Gibson reported to FCM Despain that Gibson had observed that Mother showed little inclination to care for and bond with S.E., that Mother regularly failed to attend appointments for the mental health services and case management services to which DCS referred her, and that Mother had made little progress in learning parenting skills. FCM Gibson also stated that S.E. was three months old when she was removed from Mother's care in April 2011 and that, after S.E. was removed, Mother frequently cancelled or missed supervised visits with S.E. FCM Gibson also indicated that Mother seemed to constantly suffer from various physical illnesses, which Gibson suspected were psychosomatic,[4] that Mother believed that people were following her and that her

---

Mother and Mother's husband, Leon E. The case was transferred to the Hamilton County DCS in July 2011.

[4] At the January 7 hearing, Mother testified that she suffers from a herniated disc, a pinched nerve, scoliosis, irritable bowel syndrome, high blood pressure, low thyroid, and fibromyalgia. Tr. p. 83.

apartment was "bugged," and that Mother had expressed suicidal ideations.  Tr. pp. 27-28, 31, 33.

On August 9, 2012, the Vigo County juvenile court entered an order authorizing DCS to remove three-day-old E.B.  E.B. was removed from Mother's care at the hospital the same day.  On August 13, 2012, DCS filed a CHINS petition and requested that the court authorize E.B.'s continued detention.

Forty-two visits between Mother and E.B. were scheduled between August 2012 and February 2013.  Of those, Mother attended twenty-seven, missing the others because of the weather or illness.  During Mother and Father's joint visits with E.B., Father took care of E.B. and Mother assisted him by retrieving items, such as diapers or bottles.  Often, when Mother visited E.B. without Father, she responded to E.B.'s cries only after prompting by a friend.

On January 7, 2013, after a fact-finding hearing, the juvenile court entered an order adjudicating E.B. as a CHINS.  The order stated, in relevant part:

> The child's physical and mental conditions were seriously endangered due to the neglect of her parent(s) to supply her with the necessary food, clothing, shelter, medical care, education or supervision and her environment being life and health endangering.  The child needs care, treatment, or rehabilitation that the child is not receiving and is unlikely to be provided to the child or accepted without the coercive intervention of the Court.
>
> FCM Despain responded to initial report that [Mother] just had a baby at Union Hospital and due to her mental health issues is unable to care for the child.  FCM Despain spoke to FCM Jeri Gibson of the Hamilton County office Indiana Department of Child Services, FCM Gibson stated that they have an open case in Hamilton County with [E.B.'s] older sister born on January 4, 2011.  That [their] office put in numerous services and all of the

4

services have failed. That Hamilton County is pursuing termination of parental rights.

FCM Despain spoke to Union Hospital Pediatrics staff and Social Worker, who also relayed serious concerns for [Mother's] ability to care for newborn baby. Medical staff relayed concerns of [Mother's] inability to care for the newborn due to the mother's mental capacity and failure to react to [E.B.'s] needs. Medical staff reported that [Mother] appeared more concerned with her needs and her meals rather than focusing on [E.B.'s] needs. Union Hospital medical staff reported similar concerns of [Mother] regarding the care of [E.B.], with no observations of feeding, changing the diaper/cleaning, or bonding appropriately with [E.B.].

FCM Jeri Gibson reported that [Mother] is provided services with Hamilton Center, Inc. in Terre Haute, IN, but is reported to [be] making minimal progress and focusing only on her relationship goals rather than parenting and appropriate care giving for child. FCM Jeri Gibson reported that [Mother] does not work consistently with providers for services regarding support for her and building appropriate life skills. FCM Jeri Gibson also relayed that [Mother] has extended history with infrequent services of outpatient and inpatient mental health providers during her involvement with their county.

Mother now appeals.[5]

### Discussion and Decision

The Fourteenth Amendment to the United States Constitution gives parents a right to establish a home and raise their children. In re D.G., 702 N.E.2d 777, 781 (Ind. Ct. App. 1998). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" Bester v. Lake County Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005) (quoting Troxel v. Granville, 530 U.S. 57, 65 (2000)). This interest, however, must be balanced against the State's limited authority to interfere for the protection of the children. See D.G., 702 N.E.2d at 781.

---

[5] Father has not appealed the juvenile court's order.

5

A court need not wait until a tragedy occurs to intervene. Roark v. Roark, 551 N.E.2d 865, 872 (Ind. Ct. App. 1990). Rather, the court may step in when a child is endangered by parental action or inaction. Id. As with parental rights terminations, the purpose of a CHINS adjudication is not to punish the parents, but to protect the children. In re A.I., 825 N.E.2d 798, 805 (Ind. Ct. App. 2005), trans. denied.

Indiana Code section 31-34-1-1 provides that a child under eighteen years old is a CHINS if:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
> 2) the child needs care, treatment, or rehabilitation that:
>     (A) the child is not receiving; and
>     (B) is unlikely to be provided or accepted without the coercive intervention of the court.

DCS must prove by a preponderance of the evidence that the child is a CHINS. In re N.E., 919 N.E.2d 102, 105 (Ind. 2010); In re M.W., 869 N.E.2d 1267, 1270 (Ind. Ct. App. 2007).

Here, the trial court appropriately entered findings of fact and conclusions of law in its order adjudicating E.B. a CHINS as defined by Indiana Code section 31-34-1-1. We therefore apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, whether the findings support the conclusions. In re V.C., 867 N.E.2d 167, 179 (Ind. Ct. App. 2007). We will reverse only if the evidence does not support the findings or the findings do not support the judgment. Id. We consider only the evidence most favorable to the judgment and the reasonable

6

inferences flowing therefrom.  Id.  We will not reweigh the evidence or judge the credibility of the witnesses.  Id.

Mother argues that the evidence is insufficient to support the court's CHINS adjudication because "[t]he trial court based its opinion on an impression of [Mother's] behavior which is misplaced[.]"  Appellant's Br. at 9.  Mother asserts that "[t]here are no specific findings of fact by the trial court that indicate that [Mother] was negligent or that the child's physical condition was 'seriously endangered.'"  Id. at 14.  She further claims that

> [t]he trial court speculated as to [Mother's] ability to parent [E.B.]. [Mother] was not given a chance to show her parenting "skills," nor was she aware of any "benchmarks" or that there were any necessary requirements needed by the hospital for the purpose of allowing [Mother] to be a mother and take [E.B.] home.  Essentially, these requirements amounted to a parental aptitude test where [Mother] was unaware that she was being examined.

Id. at 11.

We disagree.  Mother's argument is simply an invitation to reweigh the evidence and credibility of the witnesses, which this court will not do.  The trial court found that after E.B.'s birth, E.B.'s doctor, social worker, and hospital staff expressed concern about Mother's ability to care for E.B.; during Mother and Father's visits with E.B., Father was the primary caregiver; Mother required prompting to care for E.B.; Mother regularly missed scheduled visitations with E.B.; and FCM Despain and Union Hospital's social worker both concluded that Mother could not adequately care for E.B.  Furthermore, Mother exhibited many of these same behaviors with her other child, S.E.  This evidence supports the trial court's conclusion that E.B.'s physical and mental well-being are

7

seriously endangered and that she needs care and treatment that she is not receiving from Mother. Under these facts and circumstances, we conclude that DCS proved by preponderance of the evidence that E.B. is a CHINS.

## Conclusion

For all of these reasons, we conclude that the trial court's CHINS adjudication is supported by sufficient evidence.

Affirmed.

NAJAM, J., and BROWN, J., concur.